**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:10-CR-047** |
| | : | |
| **v.** | : | **(Chief Judge Conner)** |
| | : | |
| **TROY A. BEAM,** | : | |
| | : | |
| **Defendant** | : | |

**MEMORANDUM**

Presently before the court is convicted defendant Troy A. Beam's ("Beam")

motion (Doc. 324) for a new trial pursuant to Federal Rule of Criminal Procedure

33, alleging that the government committed discovery violations under <u>Brady</u>,

<u>Giglio</u>, <u>Jencks</u>,[1] and Federal Rule of Criminal Procedure 16.  Beam requests that the

court issue a subpoena for undisclosed IRS criminal investigation files; hold an

evidentiary hearing to determine the extent of the alleged discovery violations; and

dismiss all indictment counts with prejudice or, alternatively, vacate the judgment

against Beam and grant a new trial.  For the reasons that follow, the court will deny

the motion in its entirety.

**I.      Factual Background & Procedural History**

On February 18, 2010, an indictment (Doc. 1) was filed charging Beam with

one count of corruptly endeavoring to obstruct and impede the tax laws of the

Internal Revenue Service, in violation of 26 U.S.C. § 7212(a); one count of

attempting to evade the payment of assessed taxes, for tax years 1992 through 1998,

---

[1] 18 U.S.C. § 3500; <u>Giglio v. United States</u>, 405 U.S. 150 (1972); <u>Brady v.</u>
<u>Maryland</u>, 373 U.S. 83 (1963).

in violation of 26 U.S.C. § 7201; and four counts of willfully failing to file income tax returns, for tax years 2003 through 2006, in violation of 26 U.S.C. § 7302.  Beam's trial commenced with jury selection on April 4, 2011 and trial proceedings spanned approximately fourteen days.  (See Docs. 167, 240-52).

In general terms, the government's evidence demonstrated that Beam earned significant income through his work as a home builder and as the landlord of various rental properties in and around Shippensburg, Pennsylvania.  Despite this income, Beam had not filed a tax return since 1996 and had not paid income taxes on any earned income since 1992.  The government established that Beam used various trust entities to receive income while retaining actual control over the trust assets.  The government also showed that Beam engaged in a variety of evasive actions to hinder the IRS's tax collection efforts, such as concealing his assets, accusing IRS employees of misconduct, and directing third parties to refrain from cooperating with the IRS.  On May 4, 2011, the jury found Beam guilty on all counts charged in the indictment.  (Doc. 225).  On April 12, 2012, the court sentenced Beam to seventy-four months of imprisonment.  (Doc. 302).

Beam's case was one of multiple prosecutions that developed out of the IRS's investigation of Commonwealth Trust Company ("CTC"), an entity which marketed and sold sham trusts to individuals seeking to avoid federal tax obligations.  (Doc. 327 at 7-8; Doc. 335 at 9-10).  Following Beam's conviction, defendants in a factually similar case before our sister court in the Eastern District of Pennsylvania, United States v. Bitterman, No. 5:2009-CR-772 (E.D. Pa.), discovered much of the evidence at issue in the matter *sub judice*.  Like Beam, the defendants in Bitterman were

CTC clients convicted of criminal tax evasion.  (Doc. 327 at 8-9).  Both Beam and the <u>Bitterman</u> defendants have claimed that approximately seventy boxes of CTC marketing materials located in the IRS's Philadelphia office were improperly omitted from the government's discovery production.  (<u>Id.</u> at 8).[2]  These boxes contain "marketing brochures, trust manuals, and other written materials," as well as audio recordings from CTC seminars.  (<u>Id.</u>)  Defense counsel in <u>Bitterman</u> catalogued the marketing materials and noted why the government was allegedly obligated to produce each document during discovery.  (<u>Id.</u>)  Beam provides this catalogue with his motion and incorporates its contents by reference.  (<u>Id.</u>, Ex. A, nos. 1-375).

On June 19, 2012, the government produced an additional set of previously undisclosed IRS investigative records in response to the <u>Bitterman</u> defendants' motion for a new trial.  (<u>Id.</u> at 11).  According to Beam, "the government has never explained where these materials came from, why they were apparently kept secretly from the main IRS investigation files, or why they were first disclosed . . . in 2012."  (<u>Id.</u> at 12).  Beam asserts that this post-trial production includes evidence that impeaches the trial testimony given by government witness and former CTC principal Wayne Rebuck ("Rebuck"), (<u>id.</u> at 10-18), and provides this new evidence in tandem with the instant motion.  (<u>Id.</u>, Ex. B; Doc. 329).

---

[2] On April 9, 2015, the Honorable James Knoll Gardner denied the <u>Bitterman</u> defendants' motion for a new trial, finding the undisclosed evidence immaterial and largely cumulative of other documents produced by the government.  <u>United States v. Bitterman</u>, No. 5:2009-CR-772 (E.D. Pa. Apr. 9, 2015) (Doc. 246).

Beam filed a Freedom of Information Act ("FOIA") request with the IRS on October 13, 2013.  5 U.S.C. § 552; (see Doc. 327 at 18).  Therein, Beam sought "all criminal investigation documents, records, and files personally identifiable to him." (Doc. 327 at 18).  After requiring additional time to provide a response, the IRS answered on March 31, 2014, reporting that it had uncovered a total of 41 boxes and 281 pages of documents responsive to Beam's inquiry.  (Id. at 19).  The IRS then produced 15 pages to Beam and claimed FOIA exemptions for the withheld records. (Id.)  Specifically, the IRS invoked grand jury exemptions pursuant to Federal Rule of Criminal Procedure 6(e) and Internal Revenue Code § 6103(e)(7) with respect to the 41 undisclosed boxes of responsive material.  I.R.C. § 6103(e)(7); FED. R. CRIM. P. 6(e); (see Doc. 327 at 19).  On August 29, 2014, Beam initiated civil proceedings in federal district court against the IRS, seeking access to the 41 boxes and 266 pages of undisclosed documents.  See Beam v. IRS, No. 3:14-CV-1706 (M.D. Pa. Aug. 29, 2014) (Doc. 1).

On May 5, 2014, Beam filed the instant motion (Doc. 324) for a new trial, alleging that the proceedings were "irreparably infected with massive discovery violations that rendered the trial dramatically unfair." (Doc. 327 at 5).  Beam first asserts that the discrepancy between the 20 boxes provided by the IRS during pre-trial discovery and the 41 boxes of grand jury material responsive to Beam's FOIA request evidences a discovery violation.  (Doc. 324 at 2; Doc. 327 at 20-21).  The government responds that the FOIA exemptions are valid and that the box discrepancy is attributable to the IRS repackaging and reorganizing its case files following Beam's trial.  (Doc. 335 at 48).

Beam further avers that "the prosecution had a duty under [Federal Rule of Criminal Procedure] 16, <u>Brady</u>, and <u>Giglio</u> to disclose *all* of the CTC [marketing] information, documents, and materials obtained during the course of the government's investigation of CTC and it's [sic] principals, including . . . seventy boxes of materials kept at the IRS office in Philadelphia, upon which Beam could have predicated a more robust and believable reliance defense." (Doc. 327 at 8-9). Additionally, Beam alleges that the prosecution failed to disclose significant interviews, memoranda, and information pertaining to its key witness, Rebuck, "depriv[ing] Beam of a fair opportunity . . . to interrogate . . . [Rebuck] about the whys, whens, and wherefores of his cooperation with the government and confidential informant work." (<u>Id.</u> at 18). The government replies that the CTC marketing materials do not qualify as newly discovered evidence because Beam's trial counsel was aware of their existence, (Doc. 335 at 26-30), and that any and all undisclosed documents are cumulative of other evidence and immaterial to Beam's guilt or punishment. (Doc. 335 at 26-47). The motion is fully briefed and ripe for disposition.

## II.   <u>Legal Standard</u>

Under <u>Brady v. Maryland</u>, the government must disclose to a criminal defendant any evidence in its possession that is favorable to the defendant and material to guilt or punishment. 373 U.S. 83, 87 (1963). Both impeachment and exculpatory evidence fall within the government's disclosure duty. <u>See</u> <u>Giglio v. United States</u>, 405 U.S. 150, 154 (1972); <u>see</u> <u>also</u> FED. R. CRIM. P. 16(a)(1)(E) ("Upon a defendant's request, the government must permit the defendant to inspect and to

copy or photograph books, papers, [or] documents [that are] . . . within the government's possession, custody, or control and . . . material to preparing the defense."). The Jencks Act further requires the government to produce, upon the defendant's request, any statement of a testifying government witness which is relevant to the subject matter of their testimony. 18 U.S.C. § 3500.

A Brady violation occurs when "(1) evidence was suppressed; (2) the evidence was favorable to the defense; and (3) the evidence was material to guilt or punishment." United States v. Risha, 445 F.3d 298, 303 (3d Cir. 2006) (citing United States v. Pelullo, 399 F.3d 197, 209 (3d Cir. 2005)). The materiality prong of the Brady analysis is satisfied if "nondisclosure [is] so serious that there is a reasonable probability that [the introduction of the suppressed evidence at trial] would have produced a different verdict." Strickler v. Greene, 527 U.S. 263, 281 (1999). Such a reasonable probability exists when the fact of the evidentiary suppression is "sufficient to undermine confidence in the outcome" at trial. United States v. Bagley, 473 U.S. 667, 682 (1985); see Kyles v. Whitley, 514 U.S. 419, 434 (1995). In contrast, the mere possibility of a more favorable result for the defendant is insufficient to establish materiality. See Strickler, 527 U.S. at 291; United States v. Agurs, 427 U.S. 97, 109-110 (1976), abrogated on other grounds by Bagley, 473 U.S. 667. When undertaking this inquiry, the court must consider the suppressed evidence both individually and in the aggregate. See Kyles, 514 U.S. at 446 n.10; Johnson v. Folino, 705 F.3d 117, 129 (3d Cir. 2013).

Suppression of material evidence violates a defendant's due process rights, the standard remedy for which is a new trial. Brady, 373 U.S. at 87; see Gov't of V.I.

v. Fahie, 419 F.3d 249, 253 (3d Cir. 2005).  Dismissal is only warranted if the defendant demonstrates willful and deliberate misconduct on the part of the government.  See Fahie, 419 F.3d at 254-55.

## III.   **Discussion**

Beam seeks a subpoena demanding the production of undisclosed IRS criminal investigation files associated with his case; an evidentiary hearing to determine the extent of the alleged discovery violations; and the dismissal of all indictment counts with prejudice, or, alternatively, a new trial.  The court will address these requests *seriatim*.

### A.   **Subpoena for IRS Criminal Investigation Files**

Beam asserts that "the IRS . . . is in possession of over [41] boxes of documents from the criminal investigation file it developed and maintained on . . . Beam—over twice the number of boxes disclosed to the Beam trial defense team—but is refusing to disclose all but approximately ten pages of documents, citing to purported grand jury secrecy and law enforcement investigation concerns." (Doc. 324 at 2).  Beam submits that "although the FOIA certainly does contain various disclosure exemptions, the exemptions cited by the IRS must assuredly give way . . . to Beam's fundamental Fifth and Sixth Amendment rights." (Id.)

The government replies that Beam's assertions are no more than "pure speculation." (Doc. 335 at 49).  The government also files an affidavit from IRS Special Agent Mary Beccone ("Beccone"), wherein Beccone avers that at the conclusion of Beam's trial, she consolidated and repackaged all evidence and

exhibits into IRS archive boxes, which are "smaller than [the] bankers boxes and paper boxes . . . used prior to and during trial." (Doc. 342, Ex. 2). Upon receipt of Beam's October 2013 FOIA request, Beccone reviewed the contents of the boxes before delivering them to the IRS Disclosure Office in Philadelphia. (Id.) She attests that, during her review, she did not find "any evidence that had not been turned over to . . . Beam's defense team." (Id.)

Under Federal Rule of Criminal Procedure 6(e)(2), participants in grand jury proceedings are prohibited from revealing information regarding any "matter occurring before the grand jury." FED. R. CRIM. P. 6(e)(2). Courts have held that Rule 6(e) exempts all grand jury materials from FOIA disclosure. 5 U.S.C. § 552(b)(3) ("[FOIA] does not apply to matters that are . . . specifically exempted from disclosure by statute."); see, e.g., Manchester v. Drug Enforcement Admin., 823 F. Supp. 1259, 1267-68 (E.D. Pa. 1993), aff'd, 40 F.3d 1240 (3d Cir. 1994); Harvey v. Dep't of Justice, 747 F. Supp. 29, 38-39 (D.D.C. 1990). In the matter before the court, Beam proffers no evidence to counter the IRS's representation that the 41 undisclosed boxes constitute grand jury materials and that the 266 undisclosed pages are also protected. Rather, Beam claims hastily that a subpoena is necessary to "determine the . . . extent of discovery violations in this case," (Doc. 341 at 14), because "the assertion of grand jury secrecy just does not make any sense." (Doc. 327 at 19). The court observes that Beam's submissions are utterly bereft of citation to legal authority. Similarly, Beam offers no factual basis for his averments. In sum, Beam's *ipse dixit* assertions miss the mark entirely.

Subsequent to filing the instant motion, Beam initiated an action in district court seeking judicial review of the IRS's partial response to his FOIA request. Beam v. IRS, No. 3:14-CV-1706 (M.D. Pa.).  In so doing, Beam employs a more appropriate vehicle for pursuing agency records withheld under FOIA.  See 5 U.S.C. § 552(a)(4)(B) ("On complaint, . . . the district court of the United States . . . has jurisdiction to enjoin . . . agenc[ies] from withholding agency records."); Lame v. Dep't of Justice, 654 F.2d 917, 921 (3d Cir. 1981) ("[FOIA] places the burden of establishing that the requested materials are exempt from disclosure upon the agency.").  In view of the foregoing, the court will deny Beam's subpoena request.

**B.    Evidentiary Hearing**

Beam additionally seeks an evidentiary hearing to determine the extent of the government's discovery violations in the present case.  The purpose of a post-trial hearing is "to determine what happened, that is to establish the factual record."  United States v. Gilsenan, 949 F.2d 90, 97 (3d Cir. 1991); see, e.g., Gov't of V.I. v. Martinez, 780 F.2d 302, 306 (3d Cir. 1985) (requiring an evidentiary hearing only when "a factual question is raised as to whether a Brady violation occurred"); United States v. Herman, 614 F.2d 369, 372 (3d Cir. 1980) (holding that "a hearing need not be held in every case" involving newly discovered evidence and noting that a well-developed record on the relevant issues may vitiate the need for such); cf. United States v. Dansker, 565 F.2d 1262, 1264-65 (3d Cir. 1977) (holding that post-trial hearing to resolve issues of fact arising from conflicting affidavits).  However, "[a] hearing need not be held at the behest of a party whose allegations if established would not entitle it to relief."  Gilsenan, 949 F.2d at 97.

The court is compelled to deny Beam's request for an evidentiary hearing. Through extensive briefing, the parties have analyzed the legal and factual ramifications of the evidence in question and have presented ample argument for the court's consideration.  (See Docs. 327, 335, 341).  Moreover, Beam poses no disputed factual issues; he files all suppressed evidence in conjunction with the instant motion.  (See Doc. 327, Exs. A-H; Doc. 329).  The government acknowledges in response that it failed to produce these documents to Beam during pre-trial discovery.  See Gilsenan, 949 F.2d at 97; (Doc. 335 at 35, 43).  In light of these submissions and admissions, there is no demonstrated need for an evidentiary hearing.  Accordingly, Beam's request for an evidentiary hearing will be denied. As set forth below, the court concludes herein that the suppressed evidence, considered individually and in toto, does not entitle Beam to relief.  See Gilsenan, 949 F.2d at 97.[3]

## C.     New Trial

Beam first seeks dismissal of all counts of the indictment with prejudice, alleging discovery violations under Brady, Giglio, Jencks,[4] and Federal Rule of Criminal Procedure 16.  (Doc. 324 at 2).  Indeed, Beam's briefs are replete with conspiratorial accusations that the government willfully withheld favorable evidence from criminal defendants associated with CTC.  (See, e.g., Doc. 327 at 6,

---

[3] The court otherwise determines infra that the CTC marketing materials located in the IRS's Philadelphia office and certain other undisclosed materials were not suppressed and were cumulative of evidence introduced at trial.

[4] 18 U.S.C. § 3500; Giglio v. United States, 405 U.S. 150 (1972); Brady v. Maryland, 373 U.S. 83 (1963).

18-21; Doc. 341 at 1, 6-7, 10).  However, Beam fails to adduce substantive proof in

support of his averments.  See United States v. Claxton, 766 F.3d 280, 304 (3d Cir.

2014) ("[T]he 'rare sanction' of dismissal . . . 'may be appropriate . . . where a

defendant can show both willful misconduct by the government, and prejudice.' "

(quoting Fahie, 419 F.3d at 254-55)).  The government contends that any improper

nondisclosure was unintentional.  (See Doc. 335 at 35, 43).  Finding no evidence of

bad faith on the part of the prosecution, the court will reject Beam's request for

dismissal outright.

Alternatively, Beam petitions the court to vacate its prior judgment and

conduct a new trial.  (Doc. 324 at 2).  To properly address Beam's request, the court

must evaluate whether a Brady violation has occurred as to the two remaining

categories of evidence at issue, *to wit*: the CTC marketing materials and the new

evidence bearing upon Rebuck's testimony.

### 1.    *CTC Marketing Materials*

Beam first asserts that he would have utilized the undisclosed CTC

marketing materials to bolster his good faith defense at trial.  (Doc. 327 at 8-9).

Specifically, Beam avers that "CTC and it's [sic] principals and promoters

aggressively marketed domestic and foreign trust products . . . and aggressively

presented opinions from lawyers and CPAs that the trusts were both legal and

income tax compliant."  (Id. at 8).  According to Beam, even if the government was

not required to produce all seventy boxes of marketing materials during pre-trial

discovery, it was obligated to notify Beam of the records' existence and to provide

him with an index of their contents.  (Id. at 9).

In its opposition papers, the government responds that the CTC marketing materials were not suppressed and that Beam's trial counsel failed to act with reasonable diligence to obtain them.  (Doc. 335 at 25-34).  The government first submits that Beam's trial counsel, Attorney Lowell H. Becraft, Jr. ("Becraft"), had previously received notice of the marketing materials while serving as defense counsel in the <u>Bitterman</u> case.  (Doc. 335 at 18, 26-28).  Additionally, the government argues that the undisclosed marketing materials were cumulative of evidence produced by the government and by Beam during discovery.  (<u>Id.</u> at 29-32).

The first element of the <u>Brady</u> inquiry mandates a showing that the evidence in question was suppressed by the government.  <u>See</u> <u>United States v. Pelullo</u>, 399 F.3d 197, 209 (3d Cir. 2005).  The government is under no obligation to furnish a defendant with information that he or she "could have obtained . . . through the exercise of reasonable diligence."  <u>Id.</u> at 219 n.24; <u>see</u> <u>United States v. Starusko</u>, 729 F.2d 256, 262 (3d Cir. 1984).  Further, as the Third Circuit explained in <u>United States v. Pelullo</u>, "<u>Brady</u> and its progeny permit the government to make information within its control available for inspection by the defense, and impose no additional duty on the prosecution team to ferret out any potentially defense-favorable information from materials that are so disclosed." 399 F.3d at 212.

In the matter *sub judice*, it is undisputed that Becraft received notice of the CTC marketing materials through his prior involvement in the <u>Bitterman</u> action.  (<u>See</u> Doc. 335 at 26-28; Doc. 341 at 5).  Therein, the prosecution invited Becraft to inspect the seventy boxes stored in the IRS's Philadelphia office on multiple occasions.  (<u>See</u> Doc. 335 at 28; <u>id.</u>, Ex. 4 at 3-4; <u>id.</u>, Ex. 5); <u>see</u> <u>also</u> <u>Bitterman</u>,

12

No. 5:2009-CR-772 (Doc. 246 at 96).  Moreover, the documents exchanged between Beam and the government before trial further evidence Beam's awareness of the CTC marketing materials and his understanding of their potential utility to his defense.[5]  See Pelullo, 399 F.3d at 212, 219 n.24.  Beam later introduced certain of these records at trial, endeavoring to show that he reasonably relied upon Rebuck's representations that the trusts advertised and sold by CTC were legal.[6]

The court finds that, by virtue of Becraft's role in Bitterman and the present parties' interactions before and during trial, Beam failed to exercise reasonable diligence to access the seventy boxes of CTC marketing materials.  See Pelullo, 399 F.3d at 219 n.24.  Consequently, the court aligns with the Bitterman court in holding that the government did not suppress the undisclosed CTC marketing materials. See Bitterman, No. 5:2009-CR-772 (Doc. 246 at 98).  Furthermore, notwithstanding

---

[5] For example, during discovery, the government produced a document titled "CTC—miscellaneous course material/non-owners manual," (Doc. 335 at 31), and Beam provided "numerous CTC documents" as well as discs containing three CTC videos.  (Id. at 31-32; id., Ex. 6).  Becraft also requested that the government produce an audio recording of Rebuck at a CTC seminar on January 4, 2003 created by IRS Criminal Investigation Special Agent Chris Hueston ("Hueston").  (Id. at 29).

[6] For instance, Beam played a fifty-minute excerpt of Hueston's audio recording of Rebuck and re-played a shorter segment during closing arguments. (Doc. 249 at 185-86; Doc. 251 at 294).  Beam also introduced a pamphlet that Rebuck regularly provided at CTC seminars.  (Doc. 248 at 74; Doc. 249 at 43-44).  The pamphlet advertised the "twelve main advantages of the [CTC] pure trust," stating that "[e]very aspect . . . is perfectly lawful, guaranteed by the Constitution, Supreme Court decisions, and other court decisions" and that "[the trust] is a lawful person in the eyes of the law with the power to own, buy/sell property and other assets." (Doc. 248 at 74-75).  Additionally, while cross-examining Rebuck, Becraft highlighted two letters that Rebuck admitted to using "as a part of CTC's sales pitch."  (Doc. 240 at 259-63).  The letters, which appeared to be written by a CPA and an IRS agent respectively, represented that the trusts sold by CTC "had no tax requirements."  (Id. at 262).

the issue of suppression, it is clear to the court that the evidence at bar is

cumulative of evidence exchanged during discovery and introduced at trial, and is

thus immaterial.[7]  See United States v. Georgiou, 777 F.3d 125, 139 (3d Cir. 2015);

Johnson, 705 F.3d at 129.  In sum, the court concludes that the government did not

violate its obligations under Brady by failing to disclose the CTC marketing

materials.

### 2.    *Undisclosed Impeachment Evidence*

Beam further argues that he would have utilized certain undisclosed IRS

investigative interviews and memoranda to impeach Rebuck, a key witness for the

government.  (Doc. 327 at 10-18).  Beam avers that his success in so doing would

have strengthened his good faith defense substantially, creating a reasonable

probability of a more favorable outcome at trial.  (See id. at 10).  The government

responds by acknowledging that it was obligated to produce certain of the

undisclosed IRS records during discovery.  (Doc. 335 at 35, 43).  It contends,

however, that these suppressed materials are cumulative of (1) other discovery

provided to Beam; (2) records of which Beam had prior notice; or (3) Beam's own

trial exhibits.  (Id. at 34-47).

---

[7] The court is also cognizant of the impressive volume of documents interspersed among the various CTC prosecutions.  In the present case alone, the government has produced over 40,000 pages to Beam.  (See Doc. 335 at 21).  The prosecution's constitutional duty of disclosure is unaltered by such circumstances; however, the scope of compulsory production is inevitably shaped by the context of each case.  See, e.g., Pelullo, 399 F.3d at 210-11 (noting with approval a district court's holding that, in a case closely connected to multiple prosecutions in different jurisdictions, the government would be unreasonably burdened by a mandate to produce the discovery from each prosecution).

In essence, Beam asserts that two novel lines of impeachment may be distilled from the undisclosed evidence: (1) that Rebuck became a confidential informant in order to protect his son Mathew Rebuck's FBI career, (Doc. 341 at 10); and (2) that contrary to Rebuck's testimony, Rebuck believed the CTC trusts to be legal. (Id. at 8-9). The court will address each claim in turn.

### a. <u>Wayne Rebuck's Son</u>

Beam proffers three previously undisclosed pieces of evidence to show that Rebuck cooperated with the government to protect his son Mathew Rebuck's FBI career: two IRS Criminal Investigation Memoranda of Interview ("MOIs")—the first with confidential informant Hal Prince ("Prince"), (Doc. 327, Ex. D), and the second with Mathew Rebuck, (id., Ex. F)—and one IRS Memorandum of Telephone Conversation ("MOC") with Wayne Rebuck. (Id., Ex. H). Beam notes that, according to the first MOI, Prince represented to the IRS that Rebuck "worried that CTC . . . might find out that Rebuck's son was a commissioned special agent [with the FBI] as of the summer of 2002."[8] (Doc. 327 at 15; see id., Ex. D ¶ 6). Further, the second MOI documents Mathew Rebuck's account of his father's involvement with CTC, as articulated during an interview held on July 18, 2003. (Id., Ex. F). Therein, Mathew Rebuck explained that his father "believes that the tax laws are immoral and unconstitutional and is willing to go to jail over his beliefs" and that "CTC has

_____

[8] Dated May 21, 2003, the MOI reads as follows: "Prince stated that Rebuck confided in him that his son is employed by the Federal Bureau of Investigation as a Special Agent. Prince stated that representatives of the FBI came to Rebuck's house to interview him and his wife. Rebuck asked Prince not to reveal to anyone that his son was a FBI agent. Prince continued to say that Rebuck stated his son was fully knowledgeable about the CTC and his father's involvement." (Doc. 327, Ex. D ¶ 6).

never lost in court and therefore it was unclear to [Wayne] Rebuck if the actions of CTC were illegal." (Id., Ex. F ¶¶ 4, 14).  Finally, the MOC details a July 18, 2003 telephone conversation between Beccone and Wayne Rebuck: Rebuck called his residence from out of town, and Beccone answered, informing him that the IRS was in the process of executing a search warrant at his residence. (Id., Ex. H).  Rebuck asked whether his son Mathew was present, to which Beccone responded in the negative. (Id.)

Rebuck later testified at Beam's trial that he stopped selling CTC trusts in July of 2003 and formally ended his association with CTC in December of 2004. (Doc. 240 at 277-78).  Thereupon, he entered into a plea agreement with the United States Attorney's Office in Philadelphia. (Id. at 278).  Based upon the foregoing evidence, Beam asserts that "a principal reason [Rebuck] decided to inform for the government against his friends and clients was to protect his son Mathew and his . . . FBI career." (Doc. 327 at 16).  Specifically, Beam points to a particular confluence of events, noting first that the IRS searched Wayne Rebuck's residence on the same date that it interviewed Mathew Rebuck, and second that Wayne Rebuck knew to call his residence from out of town on that same date. (Id. at 17).  Beam contends that pre-trial access to the aforementioned evidence would have prompted him to call Hal Prince as a witness and to cross-examine Rebuck regarding "the timing and circumstances of his son approaching him and warning him that he and his CTC colleagues were under criminal investigation." (Id. at 16).

The government responds that Beam "received in discovery and was aware prior to trial of the existence of documents which would have alerted him as to

Rebuck's relationship to his son Mathew Rebuck, as well as . . . [his] employment with the FBI." (Doc. 335 at 44). Significantly, the government observes that Beam attaches to his supporting brief herein a draft stipulation from the <u>Bitterman</u> trial concerning the substance of Mathew Rebuck's testimony in that action. (<u>Id.</u> at 44 n.5; Doc. 327, Ex. G; Doc. 341, Exs. J, K). The text of said stipulation reproduces verbatim portions of the Mathew Rebuck MOI discussed *supra*. (Doc. 335 at 44 n.5; Doc. 327, Ex. G; Doc. 341, Exs. J, K). Moreover, the government submits that additional materials were available to Beam which, upon exercise of reasonable diligence, would have led him to discover the information that he claims was withheld.[9]

Beam replies that although Becraft was privy to the draft stipulation in <u>Bitterman</u>, eight MOI paragraphs which were omitted from the stipulation contained key facts. (Doc. 341 at 10; <u>id.</u>, Exs. J, K). Specifically, Beam avers that "the most notable information not included in the draft stipulation is the fact that FBI SA Mathew Rebuck was interviewed by IRS CI special agents *on the very day and at the exact time that other IRS SAs were executing a search warrant on his father's house.*" (<u>Id.</u> at 10). Without more, Beam's argument is unavailing.

The court finds that the contested evidence regarding Rebuck's motive to protect his son's career was not suppressed. <u>See</u> <u>Pelullo</u>, 399 F.3d at 219 n.24.

---

[9] For example, during discovery, the government produced the transcript from Rebuck's sentencing hearing, which identifies Mathew Rebuck as an FBI agent. (Doc. 335 at 44; <u>id.</u>, Ex. 9 at 7). The government asserts that it also produced Rebuck's prior testimony from the trial of a CTC principal, wherein "Rebuck was questioned specifically about his FBI agent son." (<u>Id.</u> at 44; <u>id.</u>, Ex. 10 at 16).

Beam admits that, by virtue of Becraft's participation in <u>Bitterman</u>, he was made aware of Mathew Rebuck and of his employment with the FBI.  (Doc. 341 at 9-10). Had Becraft exercised reasonable diligence by investigating the evidentiary underpinnings of the draft stipulation in <u>Bitterman</u>, he would have uncovered the Mathew Rebuck MOI.  <u>See</u> <u>Pelullo</u>, 399 F.3d at 213 ("Our jurisprudence has made clear that <u>Brady</u> does not compel the government 'to furnish a defendant with information which he already has or, with any reasonable diligence, he can obtain himself.' " (quoting <u>Starusko</u>, 729 F.2d at 262)).  From there, Becraft might have been prompted to investigate Rebuck's motives for disassociating with CTC and for cooperating with the government.  The court is further persuaded by the government's discovery productions which made reference to Mathew Rebuck's employment with the FBI; these documents—specifically, transcripts of Rebuck's testimony in a related prosecution and Rebuck's sentencing—were clearly relevant to Beam's case and should have been carefully examined by the defense.  In essence, manifold evidence afforded Beam the opportunity to explore this line of impeachment.  The court therefore concludes that the government did not commit a <u>Brady</u> violation by failing to disclose evidence pertaining to Mathew Rebuck's employment with the FBI.

### b.    <u>Wayne Rebuck's CTC Representations</u>

Beam proffers two previously undisclosed pieces of evidence to show that Rebuck believed that the CTC trusts were legal: (1) an IRS Criminal Investigation MOI with Rebuck, (Doc. 327, Ex. C); and (2) the Prince MOI described *supra*.  (<u>Id</u>., Ex. D).  The Rebuck MOI, dated November 9, 2006, indicates that Rebuck initially

believed the CTC trusts to be legal.[10]  (Id., Ex. C ¶¶ 6-7, 22-23).  The Rebuck MOI also notes that Rebuck attempted to recruit Prince to work for CTC during a private meeting at Rebuck's residence and that, unbeknownst to Rebuck, Prince recorded their conversation.[11]  (Id., Ex. C ¶ 10).  Additionally, the Prince MOI states that over the course of multiple discussions with Prince, Rebuck resisted the notion that CTC products were illegal, stating that "he was sure where he stood."  (Id., Ex. D ¶ 8).

Beam observes that Rebuck testified at trial "that every single client he sold CTC trust products to . . . knew, at the point of sale no less, as did he (Rebuck), that it was all a grand criminal scam against the IRS."  (Id. at 12).  According to Beam, the undisclosed Rebuck MOI would have afforded a uniquely effective line of impeachment because it directly contradicts Rebuck's testimony.  (Id. at 15).  Beam also asserts that if the Rebuck and Prince MOIs had been produced during discovery, "Beam's defense team would have known that there was an audio recording of Rebuck extolling the virtues of CTC and the legality of its trust

---

[10] In pertinent part, the MOI reads as follows: "PTO's [sic] did not have to file income tax returns, it was never established as a legal entity and therefore was not bound by the law, but was lawful. . . . The use of the CTC products was successful until it was challenged.  The IRS began prosecuting trusts in 1998.  Prior to that trusts were used successfully for decades and it would have continued if the middle class had not begun to use them.  It was a method that had fallen through the cracks.  In the beginning Rebuck thought trusts were okay, but later knew they were simply an alter ego.  Rebuck[] commented, 'Emotion sells logic tells' indicating that at the time if he did not believe in it, he would not have sold them."  (Doc. 327, Ex. C ¶¶ 7, 22).

[11] The MOI states the following: "Rebuck was approached by Hal Prince who was involved with Banyan International, an unregistered securities scheme, and indicated he was interested in CTC.  Prince met with Rebuck at his home.  During the meeting Rebuck attempted to recruit Prince as an Independent Contractor for CTC.  Prince was acting as a cooperating defendant for the Government at the time and was wearing a wire during the meeting with Rebuck."  (Doc. 327, Ex. C ¶ 10).

products . . . in the privacy of his own home with no idea [he] . . . was being taped."

(Doc. 341 at 8).  Finally, Beam avers that the Prince MOI "showed that Wayne

Rebuck's testimony that he always believed the trusts were illegal was a lie."  (Id. at

12).  The government acknowledges that these documents were: (1) improperly

suppressed; and (2) favorable to the defense.  (Doc. 335 at 35, 43); see Risha, 445

F.3d at 303.  The government contends, however, that the suppressed evidence is

cumulative of "a multitude of impeachment materials" made available to Beam

before and during trial.  (Doc. 335 at 36).

Rebuck gave the following testimony during the government's case in chief:

Q:     Was it a legitimate trust?

A:     No, sir, it wasn't.

Q:     Why not?

A:     Because the trustees didn't control any of these entities.  They were
       fraud based on . . . [sic] the trustees had control and they didn't.  The
       managing director had all the control.

       …

Q:     Did you talk to the defendant about the control of these trusts or
       purported trusts?

A:     Many times.

Q:     Did he ask you about how he would be able to maintain control of
       them?

A:     We talked about it in our meetings and it was addressed in the
       manuals that we gave Troy and other clients.

(Doc. 240 at 192, 206).  During cross-examination by Becraft, Rebuck testified as follows:

> Q:  I'm presuming that . . . your sales approach was to market these trusts as scams or as shams.  Is that not what you just said?
>
> A:  I said we clearly marketed them as tools that appeared legitimate but had been successful to hide assets, getting it out of the individual's name, hide it from the IRS and/or creditors, and I clearly said that to Troy Beam and every other person I presented the program to.
>
> …
>
> Q:  Your contention [is that] this understood position [was] that everybody that buys a trust from you is somehow, some way, trying to hide or engage in tax evasion or whatever else you want to characterize it?
>
> A:  Neither of these [pamphlets] say that trusts that [CTC] sold were to scam the IRS.  Yet in every introductory meeting I ever did and every one on one meeting I ever did[,] people, and Troy Beam included, would ask me, "How do I know the trustees won't take my property when I put it in a [CTC] trust?"  And I would tell them, "You have all the original documents.  The trustees don't know what you put in."  If you need[ed] their signature, there was usually a twenty dollar signature fee.
>
> …
>
> Q:  At what stage would somebody that bought [CTC] trusts learn the real truth, that all of this buying the trusts is set up for the purpose of scamming the IRS?  At what stage would they learn this?
>
> A:  I would say that every client, and the manual specifically instructed them, they received a manual with the first trust, that if the IRS knew that this trust was nothing but Troy Beam's alter ego it would not hold up anywhere.  Yet it appeared legitimate on the surface, thinking that the client didn't control it, the trustee controlled it.  They knew that.  It was discussed.  People took months before they ever spent their money on these things so that they were sure the trustees wouldn't take their stuff.
>
> …
>
> Q:  [W]hat was your personal understanding . . . ?

A:     My understanding was that it may have been legitimate as title insurance on property was obtained [sic] and attorneys reviewed it as title companies.  It looked like it appeared legitimate and it worked to some degree until it was scrutinized, and then it failed because it was alter ego in every case.

(Doc. 240 at 244, 249-50, 279-81).

Culled to its essence, Beam's contention is that the suppressed evidence would have provided a uniquely effective line of impeachment by virtue of its direct inconsistency with Rebuck's testimony, reproduced in relevant part *supra*. However, the court finds that the government's discovery production, as well as the evidence presented by Beam at trial, belie this assertion.  Beam's argument ultimately fails because the suppressed evidence is cumulative of other materials that were available to him, rendering it immaterial for purposes of the instant Brady analysis.  See Georgiou, 777 F.3d at 139; Johnson, 705 F.3d at 129; Risha, 445 F.3d at 303.

In its opposition brief, the government provides an extensive index of the materials that it produced to Beam during discovery which could have been used to impeach Rebuck.  (Doc. 335 at 36-43).  Many of these documents speak directly to Rebuck's original beliefs regarding the lawfulness of CTC trusts or to the misleading nature of his speeches at CTC seminars.[12]  (Id.)  The comparable nature of these discovery materials forecloses Beam's claim that the suppressed evidence

---

[12] For example, the government produced a December 20, 2004 IRS Criminal Investigation MOI documenting an interview with Rebuck.  (Doc. 335, Ex. 7).  The MOI stated, "Rebuck advised that at the time, he believed the trust documents were substantive.  He believed the trust documents would stand on their own.  Rebuck explained how he has had a change of heart regarding the CTC and its legitimacy."  (Id., Ex. 7 ¶ 35).

would have offered superior avenues of impeachment.  See Georgiou, 777 F.3d at

139; Johnson, 705 F.3d at 129.  Furthermore, Beam presented substantial

impeachment evidence at trial.[13]  Becraft even asserted during closing arguments

that "the biggest liar [in this case] was Wayne Rebuck."[14]  (Doc. 251 at 289-90).

Moreover, Rebuck's testimony was not the only evidence presented at trial

which undermined Beam's good faith defense.  The government presented

substantial evidence concerning what Beam knew or intended, including Beam's

background as a certified public accountant and auditor, the letters he received

from the IRS, and testimony from witnesses who personally interacted with Beam.[15]

Indeed, when IRS employees contacted Beam, they informed him that he was

required to file tax returns and pay taxes on the income at issue.  (See, e.g., Doc. 251

at 61-62).  Further, the government established that Beam concealed his personal

---

[13] Numerous witnesses testified that Rebuck invariably represented the trusts as legal: Beam testified that Rebuck stated at seminars that CTC sold "legal documents for legal purposes," (Doc. 250 at 74); CTC client Nancy Freese stated that Rebuck "never" represented that the trusts were illegal, (Doc. 248 at 11); CTC client Richard Dennis Boyd asserted that Rebuck never made any statement or implication regarding the trusts' illegality, (id. at 29); and CTC client Clark Wiebking, who estimated to having attended between thirty and forty CTC meetings, represented that Rebuck never stated that the trusts were illegal in any way at any meeting.  (Id. at 138).

[14] Becraft continued with the following: "How do I know that [Rebuck is a lier]?  I specifically asked Wayne Rebuck [during trial], . . . 'Did you send out or provide video tapes to people?'  And well, he denied that, even though we have here . . . his business card on some tapes."  (Doc. 251 at 290).  Becraft also highlighted "the persuasive skills of" Rebuck, asking, "If you were in the audience listening to a man like Wayne Rebuck, . . . don't you think it's possible for people to buy what he's selling?"  (Id. at 295).

[15] For instance, Beam's business partner Donnie Martin pointedly testified that Beam "decided that he wasn't going to pay taxes."  (Doc. 240 at 46).

assets, provided misinformation to the IRS, accused IRS employees of misconduct, refused to cooperate with the IRS, and directed others to do the same.

Given the multiplicity and strength of the evidence presented against Beam, the court finds no reasonable probability that if the suppressed evidence had been disclosed, a different outcome would have resulted.  See Bagley, 473 U.S. at 682; Johnson, 705 F.3d at 129 ("The materiality of Brady material depends almost entirely on the value of the evidence relative to the other evidence mustered by the state.").  Stated differently, the undisclosed evidence is immaterial because its suppression does not undermine confidence in the jury's verdict.  See Kyles, 514 U.S. at 434; Strickler, 527 U.S. at 290.  As in Bitterman, the court holds that Beam has "not identified any documents which would open new lines of impeachment, provide new evidence not already available . . . , or change the central theme of the[] defense."[16] No. 5:2009-CR-772 (Doc. 246 at 107).  Accordingly, the court concludes that the government's nondisclosure of evidence bearing upon Rebuck's credibility does not constitute a Brady violation.

---

[16] *Ad rem* herein, Judge Gardner aptly noted the following: "It is not the quantity of unproduced materials which is controlling here.  Rather, it is the quality of what was not produced.  One document, statement or a single piece of paper could have been sufficient, if that evidence had a reasonable probably of changing the jury's verdict.  However, there is no such evidence . . . ."  Bitterman, No. 5:2009-CR-772 (Doc. 246 at 107).

**IV.**     <u>**Conclusion**</u>

For all of the foregoing reasons, Beam's motion (Doc. 324) will be denied.  An

appropriate order will issue.


<u>/S/ CHRISTOPHER C. CONNER</u>
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:          May 15, 2015